ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 24-**1050**, -1051, **1052**, -1073, -1091

# In the United States Court of Appeals for the District of Columbia Circuit

COMMONWEALTH OF KENTUCKY and
STATE OF WEST VIRGINIA, *et al.*,

*Petitioners*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*

ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS, *et al.*,

*Intervenors*

———————————————

On Petitions for Review of a Final Action
of the U.S. Environmental Protection Agency

———————————————

## INITIAL BRIEF FOR STATE PETITIONERS

**RUSSELL COLEMAN**
**Attorney General of Kentucky**

Matthew F. Kuhn
  *Solicitor General*
Jacob M. Abrahamson
  *Assistant Solicitor General*
Lindsey R. Keiser
  *Assistant Attorney General*

Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov
Lindsey.Keiser@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky*        (Additional counsel below)

**PATRICK MORRISEY**
**Attorney General of West Virginia**

Lindsay S. See                          Office of the West Virginia
  *Solicitor General*                    Attorney General
Michael R. Williams               State Capitol, Bldg 1,
  *Principal Deputy*                    Room E-26
  *Solicitor General*                  Charleston, West Virginia 25305
                                              Lindsay.S.See@wvago.gov
                                              Michael.R.Williams@wvago.gov

*Counsel for Petitioner*
*State of West Virginia*

(Additional counsel listed after the signature block)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.    Parties and Amici

The State Petitioners are petitioners in Case No. 24-1050—the Commonwealth of Kentucky and the States of West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and Wyoming—and petitioners in consolidated Case No. 24-1052—the State of Texas and the Texas Commission on Environmental Quality. Along with the State Petitioners, the following are petitioners in the consolidated petitions for review: the Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association (24-1051); President of the Arizona State Senate Warren Petersen, Speaker of the Arizona House of Representatives Ben Toma, and the Arizona Chamber of Commerce and Industry (24-1073); and Essential Minerals Association (24-1091).

Respondents are the United States Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator of the United States Environmental Protection Agency.

i

Intervenors in support of Respondents are The Sierra Club, Citizens for Pennsylvania's Future, Conservation Law Foundation, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, Natural Resources Defense Council, Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund; the States of California, Arizona, Connecticut, Illinois, Maryland, Michigan, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts and Pennsylvania; the City of New York; and Harris County, Texas.

This Court has accepted Government Accountability & Oversight's *amicus curiae* in support of the Petitioners for filing.

## II.   Ruling Under Review

"Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 Fed. Reg. 16,202 (Mar. 6, 2024) (effective May 6, 2024) (Final Rule).

## III.   Related Cases

The cases consolidated with this case are:

1.    *Chamber of Commerce of the United States of America, et al. v. Environmental Protection Agency, et al.*, No. 24-2051 (D.C. Cir.).

2.    *State of Texas, et al. v. Environmental Protection Agency, et al.*, No. 24-1052 (D.C. Cir.).

3.    *Warren Petersen, et al. v. Environmental Protection Agency, et al.*, No. 24-1073 (D.C. Cir.).

4.    *Essential Minerals Association v. Environmental Protection Agency, et al.*, No. 24-1091 (D.C. Cir.).

State Petitioners are unaware of any related cases pending in this Court other than the consolidated cases.

<u>/s/</u> <u>Jacob M. Abrahamson</u>

Dated: June 6, 2024

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ...............................................................i

TABLE OF CONTENTS ...........................................................iv

TABLE OF AUTHORITIES .......................................................vi

GLOSSARY ...........................................................................xii

INTRODUCTION.......................................................................1

STATEMENT OF JURISDICTION .............................................2

STATEMENT OF ISSUES..........................................................2

STATUTES AND REGULATIONS ..............................................2

STATEMENT OF THE CASE .....................................................2

   I.      EPA must set air quality standards. ..................................3

     A.   Section 109 governs how EPA sets and revises NAAQS. ...........3

     B.   EPA applies Section 109 to PM NAAQS.............................4

     C.   Once NAAQS are set, States implement them.........................5

   II.     EPA retained standards in its 2020 Action. ...........................7

   III.   EPA reversed course in its 2024 decision to reconsider and
         revise the $PM_{2.5}$ NAAQS.............................................9

     A.   A whole-of-government climate policy led to this
         reconsideration. ..........................................................9

     B.   EPA quickly started a voluntary reconsideration. ..................10

     C.   Despite continued scientific uncertainty, EPA revised the
         $PM_{2.5}$ standard. ........................................................13

STANDARD OF REVIEW............................................................16

SUMMARY OF ARGUMENT ......................................................17

STANDING ..............................................................................18

ARGUMENT .............................................................................20

I.    The Clean Air Act does not allow EPA to use a voluntary
      NAAQS reconsideration to enact its climate agenda..............21

   A. The Clean Air Act constrains EPA's
      NAAQS-setting authority....................................................22

   B. EPA ignored those constraints in reconsidering the NAAQS
      for particulate matter.................................................23

II.   EPA failed to justify its changed course. ...............................29

   A. EPA could not lightly abandon its past practice or the
      2020 Action. ...................................................................30

   B. EPA's did not justify its early decision to reconsider its
      2020 Action. ...................................................................31

III.  In revising the PM NAAQS, EPA had to consider the
      consequences of its action............................................38

   A. EPA must consider appropriateness when revising NAAQS...39

   B. EPA's position would render Section 109 unlawful.................41

   C. EPA failed to consider the relevant factors. ...........................43

CONCLUSION ...............................................................................44

CERTIFICATE OF COMPLIANCE.......................................................52

CERTIFICATE OF SERVICE..............................................................53

# TABLE OF AUTHORITIES

## Cases

*Air All. Houston v. EPA,*
　906 F.3d 1049 (D.C. Cir. 2018) .......................................... 20, 39

*Ala. Ass'n of Realtors v. HHS.,*
　594 U.S. 758 (2021) ............................................................. 24

*Allied Loc. & Reg'l. Mfrs. Caucus v. EPA,*
　215 F.3d 61 (D.C. Cir. 2000) ................................................. 38

*Am. Farm Bureau Fed'n v. EPA,*
　559 F.3d 512 (D.C. Cir. 2009) ............................................ 4, 26

*Am. Petroleum Inst. v. EPA,*
　52 F.3d 1113 (D.C. Cir. 1995) ............................................... 23

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy,*
　72 F.4th 1324 (D.C. Cir. 2023) .............................................. 31

*Am. Trucking Ass'ns, Inc. v. EPA,*
　283 F.3d 355 (D.C. Cir. 2002) ................................................. 2

*Arizona v. EPA,*
　77 F.4th 1126 (D.C. Cir. 2023) ................................................ 9

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,*
　72 F.4th 284 (D.C. Cir. 2023) ................................................. 6

*City of Arlington v. FCC,*
　569 U.S. 290 (2013) ............................................................. 21

*DHS v. Regents of the Univ. of Cal.,*
　591 U.S. 1 (2020) ................................................................ 32

*Duncan v. Walker,*
　533 U.S. 167 (2001) ............................................................. 39

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .......................................................... 29, 31, 32, 38

*Entergy Corp. v. Riverkeeper, Corp.*,
    556 U.S. 208 (2009) ....................................................................... 40

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................. 30, 32

*Indus. Union Dep't v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) .............................................................. 21, 41, 43

*Int'l Fabricare Inst. v. EPA*,
    972 F.2d 384 (D.C. Cir. 1992) ....................................................... 38

*Lead Indus. Ass'n, Inc. v. EPA*,
    647 F.2d 1130 (D.C. Cir. 1980) ..................................................... 17

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ............................................ 1, 17, 25

*Michigan v. EPA*,
    576 U.S. 743 (2015) .......................................................... 4, 17, 39, 40

*Mississippi v. EPA*,
    744 F.3d 1334 (D.C. Cir. 2013) ................................................ 32, 33

*Miss. Comm'n on Env't Quality v. EPA*,
    790 F.3d 138 (D.C. Cir. 2015) ...................................................... 7, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ........................................................ 24, 30, 31, 40

*Murray Energy Corp. v. EPA*,
    936 F.3d 597 (D.C. Cir. 2019) ...................................................... 19

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015) ...................................................... 5

*Nat'l Ass'n of Mfrs. v. EPA*,
    750 F.3d 921 (D.C. Cir. 2014)................................. 3, 4, 7, 25, 26, 27, 33

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022)........................................................24, 42

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006).............................................43

*New Jersey v. EPA*,
    989 F.3d 1038 (D.C. Cir. 2021)........................................18, 20

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020)..............................................30

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .............................................................43

*Touby v. United States*,
    500 U.S. 160 (1991)............................................................42

*U.S. Telecom Ass'n v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017).............................................24

*West Virginia v. EPA*,
    362 F.3d 861 (D.C. Cir. 2004).............................................20

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ..................................... 18, 22, 24, 25, 42

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................... 1, 3, 21, 22, 40, 41, 42

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019)..............................................16

**Statutes**

42 U.S.C.:

§ 7407(a)............................................................................5

§ 7407(d)(1) ...............................................................5, 6, 21

§ 7408(a)(1)(A) ................................................................1, 3

§ 7408(a)(2) .............................................................3, 22, 23

§ 7409(a)............................................................................3

§ 7409(b)(1) .............................................................1, 3, 22

§ 7409(b)(2) .......................................................................3

§ 7409(d)(1) ...............................................4, 23, 25, 30, 38, 39

§ 7410(a)(1) ...................................................................6, 18

§ 7471 ...............................................................................6

§ 7513a(a)(2)(B) ................................................................6

§ 7607(b)(1) ......................................................................2

§ 7607(d)(9) .....................................................................16

§ 7502(a)(2)(A) .................................................................6

**Other Authorities**

C. Sunstein, *Is the Clean Air Act Unconstitutional?*,
98 Mich. L. Rev. 303 (1999) ...............................................43

*Climate Change Regulatory Actions and Initiatives*, EPA .....................29

*EPA Initiates New Review of the Ozone NAAQS to Reflect the Latest
Science*, EPA (Aug. 21, 2023) ............................................26

*EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged*, EPA (June 10, 2021) ................ 10, 11

*Fact Sheet: List of Agency Actions for Review*, The White House (Jan. 20, 2021) ..................................................................................... 10, 29

J. Goffman, Assistant Adm'r, U.S. Environmental Protection Agency, Initial Area Designations for the 2024 Revised Primary Annual Fine Particle NAAQS (EPA Feb. 7, 2024) ................................................ 6, 18

Letter from C. Sunstein to L. Jackson (Sept. 2, 2011) .................... 27, 32

*Most Counties with Monitors Already Meet the Strengthened Particle Pollution Standard*, EPA (Feb. 7, 2024) .............................................. 16

*President Biden Signs Executive Orders*, C-SPAN (Jan. 20, 2021) .......... 9

R. Pierce, Jr., *The Appropriate Role of Costs in Environmental Regulation*, 54 Admin. L. Rev. 1237 (2002) .................................. 41, 42

U.S. Chamber of Commerce, *EPA's Proposed Air Quality Standards Will Cause Permitting Gridlock Across Our Economy* (Nov. 2023)..... 16

## Regulations

62 Fed. Reg. 38,653 (July 18, 1997) ........................................................ 13

71 Fed. Reg. 61,144 (Oct. 17, 2006) ....................................................... 13

75 Fed. Reg. 2938 (Jan. 19, 2010) .................................................... 26, 27

78 Fed. Reg. 3,086 (Jan. 15, 2013) ................................................. 7, 8, 13

85 Fed. Reg. 82,684 (Dec. 18, 2020) ....... 7, 8, 13, 26, 28, 33, 34, 35, 36, 37

89 Fed. Reg. 16,202 (Mar. 6, 2024) .. ii, 2, 4, 5, 7, 8, 10, 11, 12, 13, 14, 15, 18, 19, 21, 24, 27, 28, 29, 32, 35, 36, 37, 38, 41, 42

Exec. Order 14,008, 86 Fed. Reg. 7,619 (Jan. 27, 2021) ......................................................... 9

Executive Order 13,990,
86 Fed. Reg. 7,037 (Jan. 25, 2021) ........................... 1, 9, 10, 21, 24, 27, 29

# GLOSSARY

| | |
|---|---|
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| PM | Particulate Matter |
| μg/m$^3$ | Micrograms per cubic meter |
| JA | Joint Appendix |
| Act | Clean Air Act |
| ISA | Integrated Science Assessment |
| PSD | Prevention of Significant Deterioration |
| SIP | State Implementation Plan |
| PA | Policy Assessment |

## INTRODUCTION

Sections 108 and 109 of the Clean Air Act require EPA to identify public-health-endangering pollutants and to set primary national air quality standards sufficient to protect public health from those pollutants. *See* 42 U.S.C. §§ 7408(a)(1)(A), 7409(b)(1). There is no doubt: "the object of § 109(b)(1)'s focus" is "the 'public health.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465–66 (2001) (*American Trucking*). So EPA's "mission is not a roving commission to achieve pure air or any other laudable goal." *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001). Protecting public health is the sole task Congress assigned it.

But in this reconsideration, EPA got its marching orders elsewhere: an executive order directing it to "advance environmental justice" and "confront the climate crisis" via actions like the Final Rule. Executive Order 13,990, 86 Fed. Reg. 7,037, 7,037 (Jan. 25, 2021) (Climate Order). Worthwhile or not, those goals "are not within EPA's portfolio." *Michigan*, 268 F.3d at 1084. What is more, EPA could only pursue that agenda (instead of its targeted statutory mission) by downplaying scientific uncertainty and ignoring nationwide consequences. That unrestrained approach resulted in the most stringent PM NAAQS ever set.

Revising a public-health regulation for climate-policy reasons was itself unlawful. But doing so without fully explaining whether the science

had changed or why the PM NAAQS were reasonable in context was arbitrary and capricious, too. The Court should vacate the Final Rule.

## STATEMENT OF JURISDICTION

EPA published the Final Rule in the Federal Register on March 6, 2024. 89 Fed. Reg. 16,202 (effective May 6, 2024), JA___. The State Petitioners filed their challenges that day, invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1).

## STATEMENT OF ISSUES

1.    Whether the Final Rule exceeds EPA's authority under Section 109 of the Clean Air Act;

2.    Whether EPA explained how updated science supported reconsidering its 2020 PM NAAQS decision; and

3.    Whether Section 109(d)(1) of the Clean Air Act required EPA to assess the full regulatory context of its decision to reconsider and revise the PM NAAQS.

## STATUTES AND REGULATIONS

The Addendum contains the relevant statutes.

## STATEMENT OF THE CASE

To enable the Court to conduct a "searching and careful inquiry into the underlying facts" of the Final Rule, *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 362 (D.C. Cir. 2002) (citation omitted), State Petitioners begin with the Final Rule's background.

2

## I.    EPA must set air quality standards.

### A.    Section 109 governs how EPA sets and revises NAAQS.

Start with the text. It requires EPA, through its Administrator, to determine what air pollutants "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A). At bottom, Congress made that determination scientific. *See id.* § 7408(a)(2) (requiring "air quality criteria" to "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected" from the pollutant).

With those science-based criteria as the cornerstone, EPA must set both primary and secondary NAAQS for identified pollutants. *Id.* § 7409(a)–(b). "'Primary' NAAQS—the standards at issue in this case—must be set at a level that EPA determines is 'requisite to protect the public health' with 'an adequate margin of safety.'" *Nat'l Ass'n of Mfrs. v. EPA*, 750 F.3d 921, 922 (D.C. Cir. 2014) (*NAM*) (quoting 42 U.S.C. § 7409(b)(1)).[1] Requisite, as used here, means "sufficient, but not more than necessary." *American Trucking*, 531 U.S. at 473.

---

[1] Secondary standards, not at issue here, must be set as "requisite to protect the public welfare from any known or anticipated adverse effects" of the pollutant. 42 U.S.C. § 7409(b)(2).

Once set, EPA must review NAAQS "at five-year intervals" or "earlier or more frequently than required." 42 U.S.C. § 7409(d)(1). No matter the timing, EPA "shall complete a thorough review of the" air quality criteria in these reviews and "shall make such revisions in such . . . standards and promulgate such new standards as may be appropriate" under §§ 7408 and 7409(b). *Id.* Appropriate, as defined in a related context, "is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). Any decision to revise is constrained by § 7409(d)(1)'s requirements, in addition to §§ 7408's and 7409(b)(1)'s.

## B.    EPA applies Section 109 to PM NAAQS.

EPA first "identified PM as an air pollutant" and "promulgated the first set of PM NAAQS" in 1971. *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 516 (D.C. Cir. 2009). PM "is a shorthand for a variety of substances that form particles in the ambient air." *NAM*, 750 F.3d at 923. The PM at issue here—fine particulate matter ($PM_{2.5}$)—was not regulated separately until EPA's 1997 PM NAAQS revision. *Am. Farm Bureau Fed'n*, 559 F.3d at 517. That process set primary annual $PM_{2.5}$ NAAQS at 15 µg/m³, *see id.*, which was lowered to 12 µg/m³ in a 2013 review, *see NAM*, 750 F.3d at 923. *See also* Final Rule at 16,207–09, JA___–___.

4

$PM_{2.5}$ are fine particles "with a nominal mean aerodynamic diameter less than or equal to 2.5" micrograms—smaller than the diameter of human hair. *Id.* at 16,207, JA___. As EPA explains, $PM_{2.5}$ has many sources: wildland fires (43%), dust (16%), agriculture (14%), stationary fuel combustion (11%), industrial processes (5%), miscellaneous sources (6%), and mobile sources like vehicles or construction equipment (5%).[2] Its specific components (and its potential effects) vary across the United States. *Id.* at 16,216, JA___. And in the two decades before EPA's 2020 Action, "national annual average $PM_{2.5}$ concentrations declined from 13.5 µg/m³ to 7.6 µg/m³, a 43% decrease." *Id.* at 16,215, JA___ (citation omitted).

## C. Once NAAQS are set, States implement them.

Because "[t]he Clean Air Act 'is an exercise in cooperative federalism,'" States implement and enforce NAAQS with EPA's guidance. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1317 (D.C. Cir. 2015) (citation omitted); *see* 42 U.S.C. § 7407(a). The first step is designating geographic areas as "attainment"—within the relevant NAAQS—or "nonattainment"—either above the allowable level or contributing to nonattainment in a "nearby area." 42 U.S.C. §§ 7407(d)(1)(A), (B). States must submit initial area designations

---

[2] Policy Assessment for the Reconsideration of NAAQS for PM at 2.1.1.1, Figure 2-2 (2022 PA), JA___.

5

to EPA within one year. *Id.* § 7407(d)(1)(A). (Their deadline here is February 7, 2025.[3]) EPA then adopts the initial designations, or modifies them as it "deems necessary," within two years of the NAAQS promulgation. *Id.* § 7407(d)(1)(B)(i)–(ii). With any modification, States get 120 days' notice and a chance to respond before finalization. *Id.* § 7407(d)(1)(B)(ii).

Once the designations are finalized, the States have "primary responsibility for assuring air quality within" their borders. *Id.* § 7407(a). Each State must prepare a SIP explaining how it will maintain or reach attainment. *Id.*; *accord id.* § 7410(a)(1). When an area is in attainment, a SIP must "contain emission limitations and such other measures as may be necessary . . . to prevent significant deterioration of air quality[.]" *Id.* § 7471.

Nonattainment areas get "more stringent regulation." *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 287 (D.C. Cir. 2023). A nonattainment designation requires (within 18 months) another SIP. 42 U.S.C. § 7513a(a)(2)(B). States in nonattainment must use "all reasonably available control measures" and "reasonably available control technology" to achieve attainment. 42 U.S.C. §§ 7502(a)(2)(A), (c)(1). That

---

[3] *See* J. Goffman, Assistant Adm'r, U.S. Environmental Protection Agency, Initial Area Designations for the 2024 Revised Primary Annual Fine Particle NAAQS at 2 (EPA Feb. 7, 2024), https://www.epa.gov/system/files/documents/2024-02/pm-naaqs-designations-memo_2.7.2024-_-jg-signed.pdf (Goffman Memorandum).

"often mean[s]" using "potentially expensive technology or expensive process changes to reduce pollution levels" quickly. *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 146 (D.C. Cir. 2015).

## II. EPA retained standards in its 2020 Action.

With that background in mind, turn to recent history. The Final Rule reconsidered EPA's 2020 Action: "Review of the National Ambient Air Quality Standards for Particulate Matter," 85 Fed. Reg. 82,684 (Dec. 18, 2020), JA___. The 2020 Action, for its part, retained the PM NAAQS, set at 12 μg/m$^3$ in 2013. Final Rule at 16,203, JA___. EPA chose that level because "several key epidemiological studies had reported statistically significant associations between adverse health effects and [PM] exposure at concentrations between 12.8 and 14.8 μg/m$^3$."[4] *NAM*, 750 F.3d at 923 (citing 78 Fed. Reg. 3,086, 3,106–08, 3,135 Fig. 4 (Jan. 15,

---

[4] Epidemiological studies evaluate the association between PM$_{2.5}$ exposure and health effects. Two methods of doing so are "monitor-based studies" and "hybrid modeling approaches." 2022 PA 3.3.3.2.1, 3-71, JA___. The former "only use ground-based monitors to estimate exposure," and the latter "employ various fusion techniques that combine ground-based monitored data with air quality modeled estimates and/or information from satellites to estimate PM$_{2.5}$ exposures." *Id.* Ground-based monitors are placed where concentration is likely highest, so hybrid approaches aim to broaden the assessed areas. Final Rule at 16,217, JA___.

Because of uncertainties in hybrid-method studies, EPA considered monitor-based studies in 2013 and 2020. 2022 PA 3.3.3.2.1, 3-71, JA___; 2020 Action at 82,711, JA___.

2013)). The standard "corresponded to the lower portions . . . of distributions of health events in the limited number of epidemiological studies for which population-level information was available." 2020 Action at 82,695, JA___.

Yet "uncertainties remaining in the scientific evidence" meant EPA in 2013 could not justify a standard below 12 μg/m³. *Id.* In 2020, those "important uncertainties and limitations . . . remain[ed] in the epidemiological evidence." *Id.* at 82,714, JA___. And recent "scientific evidence" did not "call" the 2013 standard "into question." *Id.* at 82,717, JA___. The then-Administrator added that even if he had given more weight to uncertain evidence, the 2013 standard was "below the lowest 'starting' concentration in the available accountability studies,"[5] and that, among 21 key epidemiological studies, the "mean of the study reported means (or medians)" was 13.5 μg/m³, "a concentration level above the current level of the primary annual standard of 12 μg/m³." *Id.* at 82,717–18, JA___, ____.

All that considered, EPA retained the 2013 standards. *Id.* at 82,718.

---

[5] Accountability studies try to examine "past reductions in ambient $PM_{2.5}$ and the degree to which those reductions resulted in public health improvements." Final Rule at 16,222, JA___.

### III. EPA reversed course in its 2024 decision to reconsider and revise the PM$_{2.5}$ NAAQS.

A new presidential administration meant that EPA's 2020 decision to hold PM$_{2.5}$ NAAQS steady when faced with scientific uncertainty would not last long.

### A. A whole-of-government climate policy led to this reconsideration.

From day one, President Biden declared an intent to "combat climate change in a way that we haven't done so far."[6] What he meant was an unprecedented, whole-of-government approach to environmental regulation. *See* Exec. Order 14,008, 86 Fed. Reg. 7,619, 7,622 (Jan. 27, 2021) (directing a "government-wide approach" to "combat the climate crisis with bold, progressive action" involving "the full capacity of the Federal Government"). To that end, he signed the Climate Order, "which directed federal agencies to consider whether Trump-era rules fit the new administration's agenda." *Arizona v. EPA*, 77 F.4th 1126, 1128 (D.C. Cir. 2023) (citation omitted). It charged the federal government with prioritizing "important national objectives"—including "advanc[ing] environmental justice"—"and [] immediately commenc[ing] work to confront the climate crisis." Climate Order at 7,037. The other policies it

---

[6] *President Biden Signs Executive Orders*, C-SPAN (Jan. 20, 2021), https://www.c-span.org/video/?508154-1/president-biden-signs-executive-orders.

9

announced, including "improv[ing] public health," were secondary to that ultimate climate goal. *Id.*

The weight of that White House directive triggered a regulatory avalanche. *See* Ky. DAQ Comments (EPA-HQ-OAR-2015-0072-2212) at 3–4, JA\_\_\_–\_\_\_ (flagging the difficulty in responding to the "multiple significant regulatory actions proposed" by EPA "with [EPA's] massive resources"). At EPA alone, the White House directed review of 48 decisions.[7]

### B.     EPA quickly started a voluntary reconsideration.

President Biden's list of decisions to review included the 2020 Action. *See* Final Rule at 16,210, JA\_\_\_. EPA listened. Less than six months after Climate Order, EPA announced this reconsideration. *Id.*[8]

To conduct its reconsideration, EPA promised to supplement the 2019 Integrated Science Assessment—the document that gathers and evaluates relevant science—and to update its Policy Assessment. *See*

---

[7] *See Fact Sheet: List of Agency Actions for Review*, The White House (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/ (2021 Fact Sheet).

[8] *See also EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged*, EPA (June 10, 2021), https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged (Reconsideration Announcement).

Final Rule at 16,211, JA\_\_\_. The 2019 ISA ostensibly remained "the broad scientific foundation" for EPA's reconsideration. *Id.* at 16,223, JA\_\_\_. But the ISA Supplement purported to evaluate "some studies that became available after the literature cutoff date of the 2019 ISA"—the end of 2017. *Id.* at 16,219, JA\_\_\_

So what, in EPA's view, had "changed" about the "existing corpus of scientific knowledge[?]" *Id.* at 16,257, JA\_\_\_. It added:

- Studies "that employ alternative methods for confounder[9] control" or accountability analyses. *Id.* at 16,224, JA\_\_\_.

- Experimental "controlled human exposure studies associated with cardiovascular effects at near ambient concentrations." *Id.* at 16,223, JA\_\_\_.

- Studies with "evidence of exposure or risk disparities by race/ethnicity or [socioeconomic status]." *Id.* at 16,224, JA\_\_\_.

- And recent studies examining the relationship between COVID-19 and PM.[10] *Id.*

But each "new" set of evidence cut against—or at least did not plainly support—EPA's choice to reconsider the 2020 Action:

---

[9] Confounders are outside variables that affect the variables being studied. For $PM_{2.5}$ exposure, they might "include socioeconomic status, race, age, medication use, smoking status, stress, noise, and occupational exposures." 2022 PA 3.4.2.5, 3-166, JA\_\_\_

[10] *See* Reconsideration Announcement; 2022 PA 1.4.2, 1-17, JA\_\_\_.

11

- EPA included only two new monitor-based studies (and only one reported mean concentrations under 12 µg/m$^3$, the current standard) and five hybrid-method studies. Final Rule at 16,244–45, Figs. 1–2, JA___–___. And three new accountability studies that, despite making "methodological improvements in terms of focusing on PM$_{2.5}$ and starting from a mean PM$_{2.5}$ concentration of 12 µg/m$^3$ [] or lower," shared "crucial methodological limitations that undermine their findings." NR3 Comments (EPA-HQ-OAR-2015-0072-2361), Attach. 1 at 8, JA___.

- From the controlled human exposure studies, it remained "unclear how the results from these studies alone and the importance of the effects observed in these studies, should be interpreted with respect to adversity to public health." Final Rule at 16,237, JA___.

- Studies did not "support the conclusion that there is a disparity in PM$_{2.5}$-related mortality risk associated with race/ethnicity." NR3 Comments, Attach. 1 at 18–19, JA___.

- And EPA decided against considering COVID-19 studies because "uncertainties remain due to methodological issues" like conducting studies at the height of the pandemic and overlooking "crucial factors that could influence results." Final Rule at 16,234, JA___.

On top of all that, EPA acknowledged many of the same uncertainties and limitations that existed in 2020. Final Rule at 16,276, JA___. But rather than exercise the same caution it had in 2020, EPA simply decided "to place less weight on these uncertainties." *Id.* Only after doing so did it decide to revise the NAAQS.

12

### C.   Despite continued scientific uncertainty, EPA revised the $PM_{2.5}$ standard.

In general, "the available health effects evidence . . . reflects a continuum, consisting of levels at which scientists generally agree that health effects are likely to occur, through lower levels at which the likelihood and magnitude of the response become increasingly uncertain." *Id.* at 16,219, JA___. That was true in 2020, *see* 2020 Action at 82,693, JA___, and it was true when EPA decided $PM_{2.5}$ NAAQS in 2013, 2006, and 1997, *see* 78 Fed. Reg. at 3,166–67; 71 Fed. Reg. 61,144, 61,176–77 (Oct. 17, 2006); 62 Fed. Reg. 38,653, 38,656 (July 18, 1997). Put differently, this line-drawing decision requires judgment despite significant uncertainty.

So when EPA retained the $PM_{2.5}$ NAAQS in 2020, it "focus[ed] on study reported mean (or median) concentrations from key U.S. epidemiological studies that used ground-based monitors." 2020 Action at 82,711, JA___. Because 19 of the 21 reported mean concentrations were above 12 µg/m³, and their collective mean was 13.5 µg/m³, EPA kept the NAAQS at 12 µg/m³. *Id.* That decision reflected EPA's general approach of regulating reasonably below reported means. *See, e.g.*, 78 Fed. Reg. at 3,135 Fig. 4, 3161 (revising to 12 µg/m³ given range of 12.8 µg/m³–14.8 µg/m³); 71 Fed. Reg. at 61,176–77 (retaining at 15 µg/m³ given range of 17.7 µg/m³–21 µg/m³); 62 Fed. Reg. at 38,676 (setting at 15 µg/m³ given range of 16 µg/m³–21 µg/m³).

13

EPA purported to do the same analysis here, but it reached further than the science supported. It considered 26 mean concentrations from 21 key studies. Final Rule at 16,244 Fig. 1, JA___. All but two studies were considered in the 2020 Action, and only *one* identified mean concentrations below 12 $\mu g/m^3$.[11] Plus, limits associated with such studies—including a 10–20% gap between the means and design values (which determine compliance)—persisted. *Id.* at 16,248–49, JA___–___. As one commenter flagged, "[i]t is difficult to extrapolate from these ranges to support" EPA's revised 9.0 $\mu g/m^3$ standard. Boyden Gray Comments (EPA-HQ-OAR-2015-0072-2426) at 5–6, JA___.

Armed with the same "longstanding large body of epidemiological evidence" and the same uncertainties and limits, EPA ultimately found it "appropriate to place less weight on these uncertainties than" it did in 2020. Final Rule at 16,276, JA___. By discounting uncertainty to the point of dismissal, EPA considered science that raised red flags just a few years before—all without meaningful scientific justification for doing so.

Perhaps just as important is what EPA did not consider: the real-world consequences of its decision. Like a mantra, EPA invoked a rule that "the economic and technical feasibility of attaining ambient

---

[11] Eum 2018 (one of two studies reporting multiple means) reported 9.9 $\mu g/m^3$ from the central region, 12.3 $\mu g/m^3$ from the eastern region, 11.5 $\mu g/m^3$ from the western region, and 11.65 $\mu g/m^3$ overall. Final Rule at 16,244 Fig. 1, JA___; 2022 PA, Table 3-6, 3-94–95, JA___.

14

standards are not to be considered in setting or revising NAAQS." Final Rule at 16,373, JA___; *see also, e.g.*, *id.* at 16,205, 16,206, 16,207, 16,208, 16,374, JA___, ___, ___, ___, ___. So when told that its proposal would decrease manufacturing and construction and, in turn, lead to "negative impact[s] on human health" caused by "a downturn in the economy," *see* Ky. DAQ Comments at 3, JA___; *see also* State Petitioners' Comments (EPA-HQ-OAR-2015-0072-1525) at 9–11, JA___–___, EPA provided no response. Likewise for comments about regulatory burdens caused by the revised $PM_{2.5}$ NAAQS. *See* Ky. DAQ Comments at 1–2, JA___–___.

But those burdens are significant.[12] Because EPA left a "PSD permitting exemption provision" out of the Final Rule, Final Rule at 16,370, JA___, States face immediate, costly permitting burdens. *See* Kennedy Decl. 18a–20a, ¶¶27–29; Chism Decl. 79a–80a, ¶¶28–29. Initial area designation obligations also immediately impose high costs and divert resources. *See* Kennedy Decl. 11a–13a, ¶¶13–15; Chism Decl. 74a–75a, ¶¶13–15. And that says nothing of the costs associated with implementing the NAAQS after area designations are complete, especially for nonattainment areas. *See* Kennedy Decl. 14a–18a, ¶¶19–26; Chism Decl. 75a–79a, ¶¶17–27. The estimate of nonattainment areas

---

[12] Declarations outlining the Final Rule's consequences for State Petitioners are included in the Addendum.

15

is massive. *See infra* 19 (gathering estimates from States).[13] The economic and health costs of the Final Rule will be, too.

Giving little weight to scientific uncertainty and ignoring real-world consequences resulted in a primary annual $PM_{2.5}$ NAAQS of 9 $\mu g/m^3$—the most stringent ever.

## STANDARD OF REVIEW

These challenges are brought under 42 U.S.C. § 7607(b)(1). That provision requires the Court to set aside the Final Rule "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations.'" *Wisconsin v. EPA*, 938 F.3d 303, 312 (D.C. Cir. 2019) (quoting 42 U.S.C. § 7607(d)(9)). That is "the same standard" the Court would apply to "a challenge brought under the Administrative Procedure Act." *Miss. Comm'n*, 790 F.3d at 150. Above all, EPA's "'basic obligation' is to conduct 'reasoned decisionmaking.'" *Id.* (citation omitted). The Court "does not

---

[13] One source estimates 569 counties will be designated nonattainment under the revised NAAQS. *See* U.S. Chamber of Commerce, *EPA's Proposed Air Quality Standards Will Cause Permitting Gridlock Across Our Economy* at 3 (Nov. 2023), https://www.globalenergyinstitute.org/sites/default/files/202311/Chamber%20PM2.5%20Report%20_%2011.8.23%20Final%20Draft.pdf.

EPA estimates that 119 counties do not meet the revised standard. *Most Counties with Monitors Already Meet the Strengthened Particle Pollution Standard*, EPA (Feb. 7, 2024), https://www.epa.gov/system/files/documents/2024-02/2024-pm-naaqs-final-2020-22-dv-map.pdf.

serve as a mere rubber stamp for agency decisions"; it must "ensure that agency decisions are 'based on a consideration of the relevant factors.'" *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1145 (D.C. Cir. 1980) (citation omitted).

## SUMMARY OF ARGUMENT

Applying 42 U.S.C. § 7607 here requires vacating the Final Rule. Simply put, EPA shirked its basic duty "to engage in 'reasoned decisionmaking.'" *Michigan*, 576 U.S. at 750 (citation omitted). The onus is on EPA to show that its "decreed result" is both "within the scope of its lawful authority" and the product of a "logical and rational" rulemaking process. *Id.* (citation omitted). Its Final Rule fails on both counts.

First, EPA exceeded its authority under the Clean Air Act by using Section 109—a public-health tool—to enact a broader climate agenda. That "goal" is not the "mission" Congress assigned EPA. *Michigan*, 268 F.3d at 1084. That EPA acted outside its public-health lane is made evident by the insufficient reasoning EPA supplied to justify its action. Finally, EPA's refusal to openly consider the context and consequences of the Final Rule render its decisionmaking unreasoned. This Court should vacate it.[14]

---

[14] State Petitioners agree with and adopt the Industry Petitioners' additional bases for vacatur of the Final Rule.

## STANDING

State Petitioners have standing. "Standing is usually self-evident when the petitioner is an object of the challenged government action." *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021). That is this case: revised NAAQS "trigger a process" that imposes regulatory burdens directly on State Petitioners. Final Rule at 16,205, JA___. Given those new obligations, "there can be 'little question' that the rule does injure the States[.]" *West Virginia v. EPA*, 597 U.S. 697, 719 (2022) (citation omitted).

The first "immediate implementation impact[]" of a revised NAAQS is "the initial area designations process." Final Rule at 16,365, JA ___. By February 2025, States must designate areas based on data from 2021 to 2023.[15] Doing so is time-consuming and costly. *See, e.g.*, Kennedy Decl. 11a–14a, ¶¶13–16 ($250,000 for initial designations); Boylan Decl. 57a, ¶4.a–b ($332,294 for initial designations); Chism Decl. 74a–75a, ¶¶13–15 ($1,496,222.05 for initial designations); Osborne Decl. 85a, ¶19 ($100,000 for initial designations); Bird Decl. 161a, ¶29 (320 staff hours for initial designations).

Next, States must deal with finalized designations. Their most basic obligation is to submit revised infrastructure SIPs. 42 U.S.C. § 7410(a)(1); *see also, e.g.*, Bird Decl. 165a, ¶¶42–45 (noting that submission is required regardless of designation decisions). But as EPA

---

[15] Goffman Memorandum at 2.

itself "anticipates," "the existing $PM_{2.5}$ air quality in some areas will not be in attainment" under the revised standard. Final Rule at 16,370, JA___. State Petitioners agree. *See, e.g.*, Kennedy Decl. 14a–15a, ¶19 (17 Kentucky counties); Boylan Decl. 57a, ¶4.d (7 Georgia areas); Chism Decl. 75a, ¶17 (10 Texas counties); Osborne Decl. 86a, ¶22 (4 Arkansas counties); Perry Decl. 101a, ¶14 (34 Indiana counties); Stegman Decl. 116a ¶16. So State Petitioners expect to face the high costs of addressing nonattainment, like developing and implementing nonattainment SIPs. *See, e.g.*, Kennedy Decl. 14a–18a, ¶¶18–26; Chism Decl. 78a–79a, ¶¶25–27; Parfitt Decl. 63a–64a, ¶¶7–12; Osborne Decl. 87a–88a, ¶¶27–30; Semerad Decl. 94a, ¶¶16–17; Perry Decl. 103a–104a, ¶¶19–20; Bird Decl. 162a–164a, ¶¶32–40. Many areas will be first-time designees, requiring training, outreach, and increased compliance costs. *See, e.g.*, Kennedy Decl. 16a, ¶¶21–22; Boylan Decl. 58a, ¶¶4.i–j; Chism Decl. 75a–76a, ¶¶18–20; Perry Decl., 102a, ¶15.

But State Petitioners' costs do not arise only from nonattainment. Consider another obligation: individual permitting challenges—the second of the "two most immediate implementation impacts." Final Rule at 16,365, JA___. States must apply the revised NAAQS to future permit applications *and* pending, completed applications. *Id.* at 16,370, JA ___; *see Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019). That requirement is already affecting States. *See, e.g.*, Kennedy Decl. 18a–20a,

¶¶28–29; Chism Decl. 79a–80a, ¶¶28–29 (impacting 120 pending permits in Texas); Parfitt Decl. 66a–67a, ¶¶13–16 (impacting three pending permits in Wyoming); Bird Decl. 166a–168a, ¶¶47–54 (impacting two major permits in Utah); Roberts Decl. 216a–217a.

In sum, as EPA lowers the primary annual $PM_{2.5}$ NAAQS, State Petitioners' regulatory obligations become "more difficult and onerous." *West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004). At every step— from initial designations to SIP revisions to permitting—State Petitioners must expend time and money they would not have deployed but for the Final Rule. That means it injures State Petitioners "as states." *Id.*; *accord New Jersey*, 989 F.3d at 1046 (citing "exacerbated administrative costs and burdens imposed"); *Air All. Houston v. EPA*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018) (citing "'pocketbook' injury incurred by the state itself" as an "independent proprietary interest[]." (citation omitted)). And "redressability follows from" the conclusion that State Petitioners' injuries are caused by EPA's action. *See New Jersey*, 989 F.3d at 1045–46. Vacating the Final Rule would redress the regulatory and economic harms it has caused.

## ARGUMENT

When a regulation's health benefits are uncertain and its costs are high, "responsible administration calls for avoidance of extravagant, comprehensive regulations." *Indus. Union Dep't v. Am. Petroleum Inst.*,

448 U.S. 607, 664 (1980) (Burger, C.J., concurring). Yet EPA sidestepped that axiom—and the statutory constraints behind it—in adopting the Final Rule. It abandoned its past practice and prioritized a presidential decree to "advance environmental justice" and "confront the climate crisis." Climate Order at 7,037; *see also* Final Rule at 16,210, JA ___ (citing the Climate Order as the starting point for this reconsideration). For the reasons below, that decision was unlawful.

## I. The Clean Air Act does not allow EPA to use a voluntary NAAQS reconsideration to enact its climate agenda.

The first question for the Court is whether the Act "forecloses the agency assertion of authority, or not." *City of Arlington v. FCC*, 569 U.S. 290, 301 (2013). It does, so the Final Rule is unlawful.

Section 109 gives EPA authority to protect public health from air pollutants, but that authority is not limitless. Instead, EPA's "power to act and how [it is] to act is authoritatively prescribed by Congress." *Id.* at 297. Here that means its NAAQS must be "sufficient, but not more than necessary" to protect public health. *American Trucking*, 531 U.S. at 473 (citation omitted). And the decision whether to revise NAAQS "as may be appropriate" must be made after "a thorough review" of available science. 42 U.S.C. § 7409(d)(1). Because EPA began this reconsideration to advance its climate agenda and set a standard beyond what was necessary to protect public health, the Final Rule ventures too far afield of that congressional mandate.

21

### A. The Clean Air Act constrains EPA's NAAQS-setting authority.

"Enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *West Virginia*, 597 U.S. at 723 (cleaned up) (citation omitted). The story here is simple: Other parts of the Act implicate broader environmental goals, but Section 109(b)(1) is about public health and welfare. Under its provisions, EPA must set NAAQS that "are requisite to protect the public health" with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1). Doing so requires EPA "to identify the maximum airborne concentration of a pollutant that the public health can tolerate, decrease the concentration to provide an 'adequate' margin of safety, and set the standard at that level." *American Trucking*, 531 U.S. at 465. It also requires EPA to do *only* that. *Id.* at 473 (explaining textual mandate to do no "more than necessary" to protect public health (citation omitted)).

And "public health," for its part, takes its "primary definition": "the health of the public." *Id.* at 466. EPA's public-health assessment must be rooted in the air quality criteria. 42 U.S.C. § 7409(b)(1). Those criteria must be rooted in science, not politics or climate policy. *See id.* § 7408(a)(2) ("Air quality criteria . . . shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected" from" the regulated pollutant). As practicable, the criteria must include

information like "variable factors" that "may alter the effects on public health or welfare of" $PM_{2.5}$, other pollutants that "may interact" with $PM_{2.5}$ "to produce an adverse effect on public health or welfare," and the "known or anticipated adverse effects on welfare." *Id.* § 7408(a)(2)(A)–(C).

Finally, EPA may review and revise the NAAQS and the air quality criteria. 42 U.S.C. § 7409(d)(1). The process demands "a thorough review of the" above criteria, *id.*—not a freewheeling review based on extra factors EPA thinks relevant. After that review, EPA can "make such revisions in such criteria and standards and promulgate such new standards as may be appropriate." *Id.*

To summarize: EPA sets science-based criteria and uses those criteria to set NAAQS protective of public health. It may revise NAAQS only if doing so tracks with Sections 108 and 109 and only after a thorough review of those science-based criteria and a determination that revision is appropriate. Those "specific statutory directive[s]" in Sections 108 and 109 "define[] the relevant functions of EPA in" reconsidering and revising NAAQS. *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995). Congress granted EPA discretion, but those provisions constrain it.

**B.    EPA ignored those constraints in reconsidering the NAAQS for particulate matter.**

Despite those constraints, EPA in this reconsideration wielded its NAAQS-setting authority as a tool to "advance environmental justice"

23

and "confront the climate crisis." Climate Order at 7,037; Final Rule at 16,210, JA ___. The Final Rule's origin—a presidential directive— "underscore[s] the enormous significance" attached to it. *See U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 424 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g). Presidents are no doubt permitted to reconsider policy. But they must abide by statutory constraints—"a new administration may not choose . . . to ignore statutory standards in carrying out its regulatory functions." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 59 n.* (1983) (Rehnquist, J., concurring in part).

Of course, the general statutory authority EPA asserts—the power to set and revise NAAQS—is uncontroversial. The real problem is the "mismatch" between that general authority and the specific way EPA wielded it here. *See West Virginia*, 597 U.S. at 748 (Gorsuch, J., concurring). EPA's "congressionally assigned mission and expertise" is to protect public health with a periodic review process, but its "challenged action" advances a broader climate agenda with a rushed, unconstrained reconsideration. *Id.* That merits judicial "skepticism." *Id.*; *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 118–19 (2022) (per curiam) (stating that OSHA's use of workplace rules to impose a large-scale vaccine mandate was "not 'part of what the agency was built for'" (citation omitted); *Ala. Ass'n of Realtors v. HHS.*, 594 U.S. 758, 764 (2021)

24

(rejecting the government's argument that a public-health statute "gives the CDC broad authority to take whatever measures it deems necessary to control the spread of COVID-19, including issuing the [challenged eviction] moratorium").

Put simply, EPA's "mission is not a roving commission to achieve pure air or any other laudable goal." *Michigan*, 268 F.3d at 1084. Because EPA has made its mission enacting a whole-of-government climate agenda via reconsideration, not protecting public health, its reconsideration exceeds the agency's statutory authority.

Two pieces of background reveal that EPA ventured beyond Section 109's limits in conducting this reconsideration:

*First*, EPA has never revised a NAAQS after a voluntary reconsideration. EPA's "established [NAAQS-setting] practice" matters to judging its asserted authority. *West Virginia*, 597 U.S. at 725 (citation omitted). And here, it illustrates the unprecedented nature of the Final Rule.

NAAQS are to be reviewed "at five-year intervals." 42 U.S.C. § 7409(d)(1). That "ensure[s] that the NAAQS take account of current science." *NAM*, 750 F.3d at 923. But thanks to the Climate Order's whole-

25

of-government directive, EPA ignored the statutory limits of the standard process.[16] Standard-setting for PM has never been done this way:

- EPA declared $PM_{2.5}$ an indicator for PM in 1997, 26 years after first regulating PM. *See Am. Farm Bureau Fed'n*, 559 F.3d at 516–17.

- Its next periodic review of PM NAAQS was not completed within the five-year timeline. *See id.* at 517.

- The revised 2013 PM NAAQS followed the standard (although delayed) periodic-review process. *NAM*, 750 F.3d at 923.

- And the 2020 decision to retain the PM NAAQS was conducted according to the standard process and on time. *See* 2020 Action at 82,689, JA___.

All told, EPA has never had reason to act ahead of the periodic review schedule for PM NAAQS. Nor has it ever revised any NAAQS after a rushed reconsideration.

Before 2021, EPA ordered early reconsideration only once in its history.[17] Its background might sound familiar—in 2009, EPA reconsidered a 2008 NAAQS for ozone after "a directive of the new Administration" to review "a number of actions that were taken in the

---

[16] *See* Industry Petitioners Br. at Section I.A for why EPA lacks authority for this approach.

[17] EPA more recently announced a reconsideration of ozone NAAQS, but it abandoned that approach in favor of a "full and complete review." *EPA Initiates New Review of the Ozone NAAQS to Reflect the Latest Science*, EPA (Aug. 21, 2023), https://www.epa.gov/newsreleases/epa-initiates new-review-ozone-national-ambient-air-quality-standards-reflect-latest.

last year by the previous Administration." 75 Fed. Reg. 2938, 2943 (Jan. 19, 2010). The Obama Administration ultimately tabled that reconsideration before finalization.[18] That makes this revision unprecedented. What is more, its unique ties to a presidential directive are telling. Unlike the Obama directive (a general request to review the prior Administration's significant policies) and the periodic reviews described above, this Final Rule traces its beginnings to a government-wide plan to "advance environmental justice" and "confront the climate crisis." Climate Order at 7,037; Final Rule at 16,210, JA___. In departing from its standard practices, EPA revealed its interest was in implementing presidential policies, not statutory directives from Congress. Acting faster than the statute requires may not itself be a reason to vacate the Final Rule, but what it says about EPA's motives should make the Court skeptical when EPA tries to shoehorn its results-driven standard into the statute's process-driven mold.

*Second*, EPA rushed into its unprecedented reconsideration with little real reason. At bottom, NAAQS are subject to periodic review to ensure they reflect "current science." *See NAM*, 750 F.3d at 923. So an

---

[18] *See* Letter from C. Sunstein to L. Jackson (Sept. 2, 2011), available at https://obamawhitehouse.archives.gov/sites/default/files/ozone_national _ambient_air_quality_standards_letter.pdf (Sunstein Letter).

observer might expect EPA to abandon its schedule only when recent science demands it. That is not what happened here.

True, EPA said that "the existing corpus of scientific knowledge" had "changed." Final Rule at 16,257, JA___. But the minor developments to which it gives the most weight hardly warrant the action it took: some epidemiological studies "employ[ed] alternative methods for confounder control," and recent accountability studies based their findings on $PM_{2.5}$ at a starting concentration of under 12 μg/m³. *Id.* at 16,224, JA___. Yet both categories face continued uncertainties. *See id.* at 16,226, 16,248, 16,256 JA___, ___, ___. And of the other "changed" science, only COVID-19-related studies were truly new. Because they were conducted at the height of the pandemic and missed "crucial factors" like stay-at-home orders and masking, EPA (rightly) gave them little weight. *Id.* at 16,234, JA___.

The "considerable uncertainty" that led EPA to retain the 2013 standards in 2020, *see* 2020 Action at 82,717, JA___, still existed when EPA conducted this reconsideration, despite any minimal new scientific development. EPA simply "judge[d] that it is appropriate to place less weight on these uncertainties than the then-Administrator placed on them in reaching his final decision in 2020" based on the "longstanding large body of epidemiologic evidence." Final Rule at 16,276, JA___.

This thin scientific support for EPA's reconsideration shows the real change was in EPA's policy priorities, as directed by the Climate

28

Order, not in the science. Indeed, EPA has committed to addressing the "largest sources of both climate-and health-harming pollution, such as the transportation, oil and natural gas, and power sectors."[19] The Final Rule is, of course, directed at those same sources. *See* Final Rule at 16,214, JA___ (citing "fuel combustion for electricity production," "industrial processes," "diesel- and gasoline-powered highway vehicles and other engine-driven sources"). All in all, EPA's actions are best explained by the Climate Order's directive to "advance environmental justice" and "immediately commence work to confront the climate crisis." Climate Order at 7,037; Final Rule at 16,210, JA___; 2021 Fact Sheet. Neither are lawful reasons for EPA to reconsider and revise a NAAQS, and EPA's choice to rush this reconsideration is strong evidence it worked backward from an unlawful policy goal, not forward from updated science. Section 109 permits only the latter.

## II.    EPA failed to justify its changed course.

Even if EPA had the authority to engage in this reconsideration, its methods were arbitrary and capricious. That is so because it flunked "[o]ne of the basic procedural requirements of administrative rulemaking": that it "give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Changing course

---

[19]  *Climate Change Regulatory Actions and Initiatives*, EPA, https://www.epa.gov/climate-change/climatechange-regulatory-actions-and-initiatives (last visited June 5, 2024).

from the 2020 Action, and from its past practice of conducting periodic reviews, required EPA to explain why it rejected its old approaches. Yet what it offered was light on updated scientific evidence and heavy on changed judgments, influenced by irrelevant policy priorities.

## A.    EPA could not lightly abandon its past practice or the 2020 Action.

Recall what the Act demands when EPA reconsiders a NAAQS: "a thorough review of the" science followed by revisions "as may be appropriate." 42 U.S.C. § 7409(d)(1). Thus, unlike the Administrative Procedure Act, which "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), Section 109 contains a different standard for reviewing NAAQS. That is why every time it has reviewed a PM NAAQS (and, with one exception, every time it has reviewed *any* NAAQS), EPA has conducted its "thorough review" on the standard statutory timeline. Whatever the extent of EPA's authority to review early, its practice has been not to do so.

"[D]eparting from" its past practice requires EPA to "offer a reason to distinguish" it "or explain its apparent rejection of [that] approach." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (citation omitted). Put another way, when EPA reverses its "former views as to the proper course," it must "supply a reasoned analysis for the change beyond that which may be required when an agency does not act

30

in the first instance." *State Farm*, 463 U.S. at 41–42. That is because judicial review starts from a "presumption . . . *against* changes in current policy that are not justified by the rulemaking record." *Id.* at 42.

### B.    EPA did not justify its early decision to reconsider its 2020 Action.

Under that standard, EPA fell short of adequately explaining its decision to abandon its practice of conducting standard, periodic NAAQS reviews, or its decision to reconsider and revise the NAAQS. Those "[u]nexplained inconsistenc[ies]" in the Final Rule are "'a reason for holding [it] to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars*, 579 U.S. at 222 (first alteration in original) (citation omitted). Take EPA's changes in turn:

*First*, EPA's decision to reconsider and revise a NAAQS outside the standard, periodic review process was unprecedented. *See supra* Section I.B. Yet this departure from past practice goes unacknowledged, and thus unexplained, in the Final Rule. That alone raises a red flag—"an abrupt and unexplained departure from agency precedent" is impermissible. *See Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1342 (D.C. Cir. 2023) (citation omitted).

To the extent that EPA explained its action, it treated the decision like a periodic adjustment in response to updated science. Of course, as explained above, it was doing far more. And EPA's reasons were paper-thin: it cited only the Climate Order, establishing a government-wide

climate policy, and the 2020 Policy Assessment, which was *available* to EPA when it made its 2020 Decision. *See* Final Rule at 16,210, JA ___.

Given the reliance interests at stake when EPA reverses past practice and revises longstanding NAAQS, the Final Rule needed much more. Indeed, "longstanding policies may have created serious reliance interests." *Encino Motorcars*, 579 U.S. at 222 (quoting *Fox Television*, 556 U.S. at 515). NAAQS have no doubt engendered such reliance, as the Obama Administration recognized when it urged EPA to withdraw its first attempted voluntary reconsideration because "finalizing a new standard" was "not mandatory and could produce needless uncertainty."[20] So "[w]hen [EPA] change[d] course," those interests had to "be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 222). It was "arbitrary and capricious to ignore" those same considerations here. *Id.* (citation omitted).

*Second*, the new scientific evidence EPA cited to support reconsideration and revision did not support rejecting the 2020 Action. So even if EPA had adequately explained *why* it undertook this review, the Final Rule still fails to justify the new standard EPA set. In any NAAQS review, EPA must identify a scientific basis for a revision. *See, e.g.*, *Mississippi v. EPA*, 744 F.3d 1334, 1343 (D.C. Cir. 2013) (explaining

---

[20] Sunstein Letter at 1.

how EPA "reasonably explained how the scientific evidence had in fact changed since the [last] review" of ozone NAAQS). No matter what, a NAAQS revision is appropriate only when a "thorough review" of the science demands it, not just because control of EPA has changed hands.

A note on deference: EPA will likely lean on the deference this Court pays to its "claims about competing bodies of scientific research." *NAM*, 750 F.3d at 924. But this Court grants that deference when "[r]easonable people might disagree with EPA's interpretations of the scientific evidence." *Mississippi*, 744 F.3d at 1345. That is not what is happening here. Whatever disagreements State Petitioners have with EPA's approach, *see* State Petitioners' Comments at 6–9, JA___–___, the real issue here is whether EPA offered *enough* evidence of scientific change to justify abandoning the 2020 Action.

It did not.

Recent reviews are instructive here. In 2013, "consideration of the extensive body of scientific evidence" and "confidence in the association between exposure to $PM_{2.5}$ and serious public health effects, combined with evidence of such an association in areas that would meet the current standards," led EPA to revise the $PM_{2.5}$ NAAQS. 2020 Action at 82,694, JA___; *see also NAM*, 750 F.3d at 923. But by 2020, the "scientific evidence" that developed "since the last review of the PM NAAQS" did

33

not call the 2013 PM NAAQS into question. 2020 Action at 82,717, JA___.

That was true then because it was plagued with uncertainties.

And it is true now because those uncertainties and limitations persist. Comparing the 2020 review and the Final Rule reveals as much. Start with the uncertainties EPA flagged in 2020:

- In general, "epidemiological studies . . . do not identify particular $PM_{2.5}$ exposures that cause effects and thus, they cannot alone identify a specific level at which the standard should be set." *Id.* 82,716, JA___. They present uncertainties like "exposure measurement error; potential confounding by copollutants; increasing uncertainty of associations at lower $PM_{2.5}$ concentrations; and heterogeneity of effects across different cities or regions." *Id.*

- And hybrid-method epidemiological studies create "additional challenges to comparing study reported mean concentrations to the annual standard level." *Id.* at 82,705, 82,711, JA___, ___. As ambient $PM_{2.5}$ lowers, hybrid models perform worse. *Id.* at 82,711, JA___. "[U]ncertainty" thus became "an increasingly important issue as lower predicted concentrations are considered." *Id.*

- Mean concentrations reported in epidemiological studies "are generally lower than the design value of the highest monitor in an area, which determines compliance," often by as much as "10% to 20%." *Id.* at 82,717, JA___.

- Risk estimates also have "uncertainties and limitations" including "uncertainty in the shapes of concentration–response functions, particularly at low concentrations; uncertainties in the methods used to adjust air quality; and uncertainty in estimating risks for populations, locations and air quality distributions different from those examined in the underlying epidemiological study." *Id.*

34

- And existing accountability studies (a) "have not evaluated $PM_{2.5}$ specifically," (b) "did not show changes in $PM_{2.5}$ air quality," (c) "have not been able to disentangle health impacts of the interventions from background trends in health," and (d) "have not examined air quality meeting the current standards." *Id.*

The product of all that uncertainty was administrative caution in 2020. Not so in 2024. To be sure, studies cited in the Final Rule addressed some of the issues raised in 2020. But there were few of them—on top of three accountability studies, EPA considered two new monitor-based studies (with only one reporting means below 12 µg/m$^3$) and five hybrid-method studies that made little difference to the mean concentration of the existing body of epidemiological evidence. Nor did those studies address many issues raised in 2020, much less the most serious among them. The actual meaningful change between 2020 and 2024 was in EPA leadership, not scientific evidence of public health necessity:

- Studies continued to identify "consistent, positive associations between long-term $PM_{2.5}$ exposure and mortality." Final Rule at 16,224, JA___; *see also* 2020 Action at 82,696, JA___. Indeed, health effects "can occur over the entire distribution of ambient $PM_{2.5}$ concentrations evaluated." Final Rule at 16,249, JA___. But that information has limited line-drawing value: epidemiological studies cannot "identify particular $PM_{2.5}$ concentrations that do not elicit health effects." *Id.* Or, as the 2020 Action phrased it, "they cannot alone identify a specific level at which the standard should be set." 2020 Action at 82,716, JA___.

- Exposure measurement error remained a problem, and EPA found that studies "further inform[] our understanding of the influence of exposure measurement error due to exposure estimation methods."

35

Final Rule at 16,248, JA___. EPA sought to reduce that influence with "studies using hybrid modeling methods," but it acknowledged "inherent limitations and uncertainties," including "poorer model performance" that "often coincide[s] with relatively low ambient $PM_{2.5}$ concentrations, in areas where predicted exposures are at a greater distance to monitors, and under conditions where the reliability and availability of key datasets (*e.g.*, air quality modeling) are limited." *Id.*; *see also* 2020 Action at 82,711, JA___.

And "[r]egardless of whether" studies use monitor-based or a hybrid modeling approach, "one key limitation that persists is associated with the interpretation of the study-reported mean $PM_{2.5}$ concentrations and how they compare to design values, the metric that describes the air quality status of a given area relative to the NAAQS." Final Rule at 16,248, JA___. Indeed, design values remain "approximately 10% to 20% higher than annual average composite monitor concentrations." *Id.* at 16,262, JA___. So "the range of area annual design values associated with the lowest mean concentration (*i.e.*, 9.9 µg/m³) reported in these studies would be 10.9-11.9 µg/m³." NR3 Comments, Attach. 1 at 4, JA___. In other words, well above the Final Rule's 9.0 µg/m³ standard.

- Uncertainty related to "potential confounding" likewise persisted. Final Rule at 16,226, JA___. EPA referenced "a few studies" that "use statistical techniques to reduce" those uncertainties. *Id.* They "suggest the presence of some unmeasured confounding" but "do not indicate the direction or magnitude of the bias." *Id.*

- Heterogeneity is also still observed "between cities and geographic regions within the U.S." *Id.* at 16,248, JA___. Studies in the 2019 ISA and ISA Supplement "indicate that the heterogeneity in $PM_{2.5}$ mortality risk estimates cannot be attributed to one factor, but instead a combination of factors." *Id.* at 16,228, JA___.

- Risk estimates remain uncertain due to "assumptions about the shape of the [concentration–response] function with mortality at low ambient PM concentrations, the potential for confounding

and/or exposure measurement error in the underlying epidemiologic studies, and the methods used to adjust $PM_{2.5}$ air quality." *Id.* at 16,250, JA___. Additionally, as one commenter noted, "a risk assessment that evaluates impacts of $PM_{2.5}$ on all-cause mortality" must address the limited evidence for "biologically plausible means by which $PM_{2.5}$ could contribute to" "40–60% of deaths." Tex. Comm'n on Env't Quality Comments (EPA-HQ-OAR-2015-0072-2192) at 3, JA___.

- And although EPA looked to accountability studies that evaluated $PM_{2.5}$ at "concentrations at or below 12 μg/m$^3$," Final Rule at 16,256, JA___, those studies remain unable to "disentangle health impacts of the interventions from background trends in health." 2020 Action at 82,717, JA___.

This long list of scientific uncertainty reveals one reason why EPA's abandonment of the 2020 Action was arbitrary and capricious. Indeed, EPA itself recognized that uncertainty persisted, but it chose "to place less weight on" it than it did in 2020. Final Rule at 16,276, JA___. So updated policy views, not updated scientific certainty, are behind EPA's decision. That change is not enough. Without updated science, EPA could not abandon the 2020 Action.

On top of all that, commenters warned EPA of its failure. *See, e.g.*, State Petitioners' Comments at 6, JA___ ("EPA offers only studies of dubious merit, or studies confirming what was already known at the time of the 2020 Action"); Tex. Comm'n on Env't Quality Comments at 5, JA___ ("Changes to NAAQS should be the result of significant improvements in the underlying science that are well documented by the

EPA Administrator, including appreciable reduction of the significant scientific uncertainties identified in previous PM reviews outlined above."); NR3 Comments at 25–26, JA___–___ (detailing how EPA "glosses over and swerves from past, contrary determinations without explanation"). "For [EPA's] decisionmaking to be rational," it had to address those "significant points raised during the public comment period." *Allied Loc. & Reg'l. Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). That EPA did not respond is another reason for this Court to "overturn [the] rulemaking as arbitrary and capricious." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992). It should do just that.

## III. In revising the PM NAAQS, EPA had to consider the consequences of its action.

Lastly, even if EPA had authority to reconsider the 2020 Action *and* had a reasoned basis for doing so, its ultimate decision was unreasoned because it ignored the full regulatory context. As noted above, EPA must be held to the "basic procedural requirement[]" that it "give adequate reasons for its decisions." *Encino Motorcars*, 579 U.S. at 221. EPA believes that it can never—under any circumstances—consider economics or feasibility in revising NAAQS. *See, e.g.*, Final Rule at 16,373, JA___. But Section 109(d)(1) requires EPA to explain why its decision to revise a NAAQS is "appropriate," an explanation that necessarily includes factors like the cost and feasibility of the Final Rule.

38

### A.  EPA must consider appropriateness when revising NAAQS.

On how Sections 109(b)(1) and 109(d)(1) operate, the Industry Petitioners are right, and the Final Rule is wrong. This brief need not repeat every reason why, *see* Industry Petitioners Br. at Sections I.B, II, but three points bear emphasis.

*First*, Section 109(d)(1) requires that EPA revise a NAAQS only "as may be appropriate[.]" That NAAQS-revision requirement is separate from the NAAQS-setting requirement in Section 109(b)(1) and thus the statutory term "appropriate" must have independent meaning. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (requiring courts to "give effect, if possible, to every clause and word of a statute" (citation omitted)). "EPA cannot escape Congress's clear intent to specifically limit" its authority to review and revise "by grasping at its separate, more general authority" to set NAAQS. *See Air All. Houston*, 906 F.3d at 1061 (interpreting EPA's authority to delay a rule's effective date pending reconsideration).

*Second*, the Supreme Court's *Michigan* decision properly defines appropriateness as "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." 576 U.S. at 752 (citation omitted). So the Supreme Court expects agencies to consider "cost as a centrally relevant factor when deciding whether to regulate" because "reasonable regulation ordinarily requires

39

paying attention to the advantages and the disadvantages of agency decisions." *Id.* at 752–53. The Court thus rejected EPA's argument that it could not consider "*any* type of cost—including, for instance, harms that regulation might do to human health or the environment." *Id.* at 752. "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Id.*

*Finally*, *American Trucking* is not to the contrary. It addresses whether EPA "may consider the costs of implementation in setting [NAAQS] under § 109(b)(1)." 531 U.S. at 462. And in doing so, it "stands for the rather unremarkable proposition that sometimes statutory silence, when viewed in context, is best interpreted as limiting agency discretion." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009); *accord Michigan*, 576 U.S. at 755–56. More to the point, *American Trucking* considered a provision that did not include the "appropriate" qualifier—unlike Section 109(d)(1).

Nor did *American Trucking* wipe away EPA's obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). Indeed, the Court noted that the Act requires EPA "to make judgments of degree" for "pollutants that inflict a continuum of adverse health effects at any

40

airborne concentration greater than zero." 531 U.S. at 475. In other words, it must exercise a "certain degree of discretion." *Id.* (citation omitted). Contextual factors like "the public's ordinary tolerance of the particular health risk in the particular context at issue," the "comparative health risks," and "the acceptability of small risks to health" inform that discretion. *Id.* at 494–95 (Breyer, J., concurring). After all, the Act "does not require the EPA to eliminate every health risk, however slight, at any economic cost, however great, to the point of 'hurtling' industry over 'the brink of ruin,' or even forcing 'deindustrialization.'" *Id.* at 494 (Breyer, J., concurring); *see also Indus. Union Dep't*, 448 U.S. at 664 (Burger, C.J., concurring) ("Perfect safety is a chimera; regulation must not strangle human activity in the search for the impossible.").

If necessary, this Court should adopt this proper interpretation of Section 109(d)(1).

## B.    EPA's position would render Section 109 unlawful.

EPA's version of *American Trucking* violates the nondelegation doctrine. To EPA, the Act gives no authority to consider costs, yet "does not require" a NAAQS set "at a zero-risk level." Final Rule at 16,291, JA___. In between? A level of discretion Congress did not intend to grant.

EPA considers the overall costs of NAAQS—as one scholar noted, "it is impossible to make a rational decision to decline to act in a manner

41

that improves public health without considering the costs of the action in some way." R. Pierce, Jr., *The Appropriate Role of Costs in Environmental Regulation*, 54 Admin. L. Rev. 1237, 1265 (2002). *American Trucking* says as much. 531 U.S. at 475 (discussing EPA's "judgments of degree"). EPA simply disclaims any need to tell the public *how* it does so. *See* Final Rule at 16,206, JA___ ("The selection of any particular approach to providing an adequate margin of safety is a policy choice left specifically to the Administrator's judgment.").

But by EPA's logic, it could revise NAAQS to a zero-risk level, no matter the economic implications, if that is what EPA thought was required. Indeed, if a future Administrator agreed with some Intervenors that "there is no safe threshold for $PM_{2.5}$ exposure," ECF#2048433 at 8 (Apr. 5, 2024), the authority it asserts here could support that result. That reading "would afford it almost unlimited discretion—and certainly impose no 'specific restrictions' that 'meaningfully constrai[n]' the agency." *NFIB*, 595 U.S. at 126 (Gorsuch, J. concurring) (alteration in original) (quoting *Touby v. United States*, 500 U.S. 160, 166–67 (1991)). The "basic and consequential tradeoffs involved" in such a decision "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U.S. at 730. That sweeping delegation would no longer "fit[] comfortably within the scope of discretion permitted by" the Supreme Court's constitutional caselaw. *American Trucking*, 531 U.S. at 476.

42

To prevent this nondelegation problem, this Court should favor "[a] construction of the statute that avoids this kind of open-ended grant." *Indus. Union Dep't*, 448 U.S. at 646 (plurality). But if *American Trucking* does sweep as broadly as EPA claims, then its nondelegation holding was mistaken. Recognizing that the Court cannot correct that mistake, State Petitioners respectfully preserve the issue for review.

### C.    EPA failed to consider the relevant factors.

If considerations like the potential harms caused by revised PM NAAQS are relevant to this rulemaking, EPA openly disregarded them.

That was arbitrary and capricious and outside EPA's authority. EPA knew real harms would result from the Final Rule. *See, e.g.*, State Petitioners' Comments at 9–11, JA___–___; *see also, e.g.*, C. Sunstein, *Is the Clean Air Act Unconstitutional?*, 98 Mich. L. Rev. 303, 375 (1999) ("If a regulation produces less employment and more poverty, it may result in worse health as well."). Yet it refused to consider them. The Court must judge EPA's decision by "the grounds upon which" it relied, not "[its] own justifications" or EPA's "post hoc rationalizations." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). Without considering the harms of this revision, EPA's grounds are plainly insufficient.

## CONCLUSION

The State Petitioners' petitions for review should be granted and the Final Rule should be vacated.

Respectfully submitted,

**RUSSELL COLEMAN**
**Attorney General of**
**Kentucky**

/s/ Jacob M. Abrahamson
Matthew F. Kuhn
 *Solicitor General*
Jacob M. Abrahamson
 *Assistant Solicitor General*
Lindsey R. Keiser
 *Assistant Attorney General*
Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov
Lindsey.Keiser@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky*

**PATRICK MORRISEY**
**Attorney General of**
**West Virginia**

/s/ Michael R. Williams
Lindsay S. See
 *Solicitor General*
Michael R. Williams
 *Principal Deputy*
 *Solicitor General*
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, West Virginia 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for Petitioner*
*State of West Virginia*

(Counsel for Additional Petitioners Below)

44

**STEVE MARSHALL**
**Attorney General of Alabama**

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Petitioner*
*State of Alabama*

**TREG R. TAYLOR**
**Attorney General of Alaska**

/s/ Cody Doig
Cody Doig
  *Senior Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 269-5211
cody.doig@alaska.gov

*Counsel for Petitioner*
*State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/ Nicholas J. Bronni
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner*
*State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**

/s/ Henry C. Whitaker
Henry C. Whitaker
  *Solicitor General*
James H. Percival
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for Petitioner*
*State of Florida*

45

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

/s/ Stephen J. Petrany
Stephen J. Petrany
  *Solicitor General*
Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Petitioner*
*State of Georgia*

**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Joshua N. Turner
Joshua N. Turner
  *Chief of Constitutional Litigation*
  *and Policy*
Alan M. Hurst
  *Solicitor General*
Office of the Idaho
Attorney General
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for Petitioner*
*State of Idaho*

**THEODORE E. ROKITA**
**Attorney General of Indiana**

/s/ James A. Barta
James A. Barta
  *Solicitor General*
Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for Petitioner*
*State of Indiana*

**BRENNA BIRD**
**Attorney General of Iowa**

/s/ Eric H. Wessan
Eric H. Wessan
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Petitioner*
*State of Iowa*

46

**KRIS KOBACH**
**Attorney General of Kansas**

/s/ Anthony J. Powell
Anthony J. Powell
  *Solicitor General*
Office of Kansas Attorney General
Kris W. Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Office: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for Petitioner*
*State of Kansas*

**LIZ MURRILL**
**Attorney General of Louisiana**

/s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga
  *Solicitor General*
Office of the Louisiana
Attorney General
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 485-2458
aguinagab@ag.louisiana.gov

*Counsel for Petitioner*
*State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**

/s/ Justin L. Matheny
Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi
Attorney General
P.O. Box 220
Jackson, Mississippi 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner*
*State of Mississippi*

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine
  *Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, Missouri 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for Petitioner*
*State of Missouri*

47

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Christian B. Corrigan
Christian B. Corrigan
  *Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Petitioner*
*State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ Grant D. Strobl
Grant D. Strobl
  *Assistant Solicitor General*
Office of the Attorney General
of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Grant.Strobl@nebraska.gov

*Counsel for Petitioner*
*State of Nebraska*

**DREW WRIGLEY**
**Attorney General of**
**North Dakota**

/s/ Philip Axt
Philip Axt
  *Solicitor General*
North Dakota Attorney
General's Office
600 East Boulevard Avenue,
Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Petitioner*
*State of North Dakota*

**DAVE YOST**
**Attorney General of Ohio**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
  *Solicitor General*
Mathura Sridharan
  *Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad Street, Floor 17
Columbus, Ohio 43215
(614) 466-8980
elliot.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for Petitioner*
*State of Ohio*

**GENTNER F. DRUMMOND**
**Attorney General of Oklahoma**


/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*
Oklahoma Office of the
Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov

*Counsel for Petitioner*
*State of Oklahoma*


**MARTY J. JACKLEY**
**Attorney General of**
**South Dakota**

/s/ Steven Blair
Steven Blair
  *Deputy Attorney General*
South Dakota Attorney
General's Office
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for Petitioner*
*State of South Dakota*

**ALAN WILSON**
**Attorney General of**
**South Carolina**


/s/ Joseph D. Spate
Robert D. Cook
  *Solicitor General*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor General*
Joseph D. Spate
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Petitioner*
*State of South Carolina*

**JONATHAN SKRMETTI**
**Attorney General & Reporter**
**of Tennessee**

/s/ Whitney Hermandorfer
Whitney Hermandorfer
  *Director of Strategic Litigation*
Harrison Gray Kilgore
  *Strategic Litigation Counsel*
  *and Assistant Solicitor General*
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Harrison.Kilgore@ag.tn.gov

*Counsel for Petitioner*
*State of Tennessee*

**SEAN D. REYES**
**Attorney General of Utah**

/s/ Stanford E. Purser
Stanford E. Purser
  *Solicitor General*
Office of the Utah Attorney General
160 E. 330 S., 5th Floor
Salt Lake City, Utah 84111
(385) 382-4334
spurser@agutah.gov

*Counsel for Petitioner*
*State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**

/s/ D. David DeWald
D. David DeWald
  *Deputy Attorney General*
Wyoming Attorney General's
Office Water & Natural
Resources Division
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 phone
(307) 777-3542 fax
david.dewald@wyo.gov

*Counsel for Petitioner*
*State of Wyoming*

50

**KEN PAXTON**
**Attorney General of Texas**

**BRENT WEBSTER**
**First Assistant Attorney**
**General**

**JAMES LLOYD**
**Deputy Attorney General for**
**Civil Litigation**

**KELLIE E. BILLINGS-RAY**
**Chief, Environmental**
**Protection Division**

/s/ Clayton Smith
CLAYTON SMITH
Assistant Attorney General
D.C. Circuit Bar No. 65145
Texas Bar No. 24091234
clayton.smith@oag.texas.gov

Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Tel: (512) 971-0139
Fax: (512) 320-0911

*Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality in Consolidated Case No. 24-1052*

51

## **CERTIFICATE OF COMPLIANCE**

As required by Federal Rule of Appellate Procedure 32(f) and (g), I certify that this brief complies with this Court's May 14, 2024 Scheduling Order, because it contains 9,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Century Schoolbook font using Microsoft Word.

*/s/* Jacob M. Abrahamson

52

## **CERTIFICATE OF SERVICE**

I certify that on June 6, 2024, I electronically filed the above with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/* Jacob M. Abrahamson